1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
2                           COLUMBIA DIVISION

3
        United States of America, )
4                                 )
                     Plaintiff,   )
5                                 )      3:17-cr-811
                     -versus-     )      3:19-cr-781
6                                 )      March 15, 2022
        Terrence Vernon Dunlap,   )      Columbia, SC
7                                 )
                     Defendant.   )
8       _____)

9

10            BEFORE THE HONORABLE MARY GEIGER LEWIS
             UNITED STATES DISTRICT JUDGE, PRESIDING
11                      Sentencing Hearing

12      A P P E A R A N C E S :

13

14      For the Government:     Jane Taylor, AUSA
                                United States Attorney's Office
15                              1441 Main Street, Suite 500
                                Columbia, SC  29201
16
        For the Defendant:      Jonathan Harvey, Esq.
17                              Jonathan Harvey Law Office
                                1701 Richland Street
18                              Columbia, SC  29201

19                              J Christopher Mills, Esq.
                                J Christopher Mills Law Office
20                              PO Box 8475
                                Columbia, SC  29202
21
        Court Reporter:         Kathleen Richardson, RMR, CRR
22                              United States Court Reporter
                                901 Richland Street
23                              Columbia, SC 29201

24
                   STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
25                          *** *** *** ***

1          THE COURT:  All right.  Ms. Taylor?

2          MS. TAYLOR:  If it please the Court, Your Honor.

3    The first matter this morning is United States of America

4    versus Terrence Vernon Dunlap, also known as Tex.  Mr. Dunlap

5    is present this morning represented by Mr. Jonathan Harvey

6    and Mr. Chris Mills and -- oh, I believe that I need to put

7    on the record two case numbers, and I only have one in front

8    of me.  Beg the Court's indulgence.

9          THE COURT:  I think I have both of them.

10          MR. HARVEY:  19-781.

11          THE COURT:  Yeah.  It's 3:17-811 and 3:19-781.

12    Yeah.

13          MS. TAYLOR:  Thank you, Your Honor.  I didn't put

14    that in front of me.

15       Mr. Dunlap is here to be sentenced on both of those

16    cases.  One presentence report has been issued as to both,

17    and Mr. Dunlap has filed objections to that presentence

18    report.

19          THE COURT:  All right.  Thank you.  All right.  Mr.

20    Harvey, is your client ready to proceed?

21          MR. HARVEY:  Yes, Your Honor.

22          THE COURT:  All right.  I have reviewed the

23    evidence that was presented at the trials, the combined -- or

24    the trial and then the plea hearing, the combined presentence

25    investigation report, the plea agreement in 3:19-781, the

1  preliminary order of forfeiture that was just filed, as well

2  as your memorandum in support of the objections you lodged to

3  the PSR and your motion for downward departure and variance.

4      Is there anything else that I need to look at before we

5  get started?

6          *MR. HARVEY:* Nothing from me, Your Honor. No,

7  ma'am.

8          *THE COURT:* Okay. All right. Then Mr. Dunlap, if

9  you would stand, please. All right. Sir, have you had --

10 based on the objections that have been lodged, it looks to me

11 like you have been over the report carefully with Mr. Harvey.

12 Is that accurate?

13         *THE DEFENDANT:* Yes, ma'am.

14         *THE COURT:* All right. Has he answered all of your

15 questions about the report?

16         *THE DEFENDANT:* Yes, ma'am.

17         *THE COURT:* Mr. Dunlap, do you understand the

18 contents of your presentence report?

19         *THE DEFENDANT:* Yes, ma'am.

20         *THE COURT:* All right. Mr. Harvey, it obviously

21 looks like you have been over this pretty carefully. Have

22 you had enough time to explain all of that to your client?

23         *MR. HARVEY:* I have, Your Honor.

24         *THE COURT:* All right. You believe that Mr. Dunlap

25 understands the presentence report?

1          MR. HARVEY:  I do, Your Honor.

2          THE COURT:  Okay.  All right then.  And then Mr.

3     Dunlap, if you'd like to be seated, you may.

4        All right.  Mr. Harvey, you have got a number of

5     objections to the report.  The first one being to the offense

6     conduct, paragraphs 18, 23, 31 and 32.  Be happy to hear from

7     you on that.  I have reviewed what you have filed, but I'd be

8     happy to hear from you.

9          MR. HARVEY:  Thank you, Your Honor.  I would

10    incorporate by reference my sentencing memorandum.  And to

11    the extent that it complements or augment my argument any

12    comments by Mr. Mills in his case, this is somewhat unusual

13    that we have two cases in one sentencing.

14         THE COURT:  Yes.

15         MR. HARVEY:  And two cases in one presentence

16    report.  Your Honor, the gist--

17         THE COURT:  Mr. Harvey, just while you're talking

18    on the record, if you would pull your mask down, I would

19    appreciate it.  I'm getting to be kind of hard of hearing,

20    apparently.

21         MR. HARVEY:  It's unusual for someone to ask me to

22    talk more or speak up, so...

23         THE COURT:  Well, I'm just referring to the volume,

24    okay?

25         MR. HARVEY:  Thank you, Your Honor.  So Your Honor,

as outlined in the sentencing memo, I think if we look at the

drug quantity issue maybe in tandem, so what we have in our

case is we have the presentence report calculated the drug

quantities based upon largely interpretation of wiretap

conversations.

 And as I conceded in the sentencing memorandum, we're

not saying that that methodology hasn't been approved, hasn't

been accepted and, in circumstances, can be found to be

reliable.  However, in this instance, what's critical is it

has to be applied reliably in the context of the case.

 And what I did, Your Honor, is I made a chart, and I

actually have with me today a booklet, if we need to, to look

at the line sessions.  But in essence, the argument is that

the unreliable application of the interpretation is that

specifically the term, thing, has been used to mean an ounce

quantity, and in its application it was given different

quantity amounts.  And in the chart, part of the chart was to

show that it had been applied to mean an ounce.

 So, the gist of that argument is the method's been

approved, our courts have held if you use that method, it

needs to be applied reliably.

 THE COURT:  Which means consistently.

 MR. HARVEY:  Yes.

 THE COURT:  Yeah.  Okay.

 MR. HARVEY:  And so in this instance, the gist of

1   the argument is it was not applied consistently, and I would

2   ask Your Honor to note that there wasn't an objection to the

3   total amount of drugs.  It wasn't a blanket objection.

4       And I want Your Honor to know that Mr. Dunlap

5   understands that he wanted to make sure that this argument

6   was presented in the right context rather than saying, well,

7   everything is unreliable.  That would strain credibility with

8   the Court and I think be contra-productive for my client.

9   But it's clear that that term was applied inconsistently.

10      And so by my calculation, what I did on the chart is I

11  added up on chart A the grams listed in the column under

12  cocaine weight, and that came to 2991.5 grams.  I multiplied

13  that by 200 and divided it by a thousand, and my University

14  of Georgia math said that was 598.3 grams.  And as a Georgia

15  graduate, I must admit I relied on a calculator to do it.

16      So Your Honor, then I subtracted that amount from the

17  presentence report weight, and that gave a cocaine weight of

18  1116.8.  I guess that would be the kilograms in converted

19  weight.  I applied the same methodology with the heroin and,

20  Your Honor, on the graph when we refer to session 7335, that

21  was the most puzzling one in the entire matter because it was

22  just -- I could not discern what that conversation was about.

23      And I have got it... and that was where a thousand grams

24  came from, and I don't know if I could -- with the Court's

25  permission, I guess in order to make sure that we have a

1    record, may I read that transcript into the record -- or

2    Ms. Taylor, do you want to...

3           *MS. TAYLOR:* You may read it.

4           *MR. HARVEY:* Your Honor, so this is session 7334

5    looking at a transcript synopsis name Dante Cornbread, comma,

6    Dante Bubba, Terrence Dunlap to SS, yo, Cornbread was looking

7    for you. SS huh? Cornbread. Terrence, hey that nigga

8    Dante, I told you that nigga saying shit, bro. Santerrio,

9    what? Oh, boy dog, SS, who -- Terrence, man broke ass, broke

10   man, for real Cornbread just told me that nigga said, you

11   know what I'm saying. What that nigga be talking about just

12   talking fuck that nigga, bro. Who? That old boy. Who?

13   Bubba. Yeah. What that nigga be talking about? Terrence,

14   some crazy ass shit. Yeah, he said Cornbread, you know what

15   I'm saying. Yeah, but what going on? Santerrio, shit, he

16   hit me, dog. Terrence, tell me, man, when the man's on the

17   way. In a minute. I'm about to come over there.

18       That conversation was attributed a thousand kilograms of

19   heroin. And so, again, the application -- there's no

20   indication -- and that was taken in the presentence report in

21   the context of that conversation. And so again, the

22   objection is the consistent application. And--

23           *THE COURT:* You're saying it should--

24           *MR. HARVEY:* I don't know where--

25           *THE COURT:* Referring to that particular

1    conversation, you can't tell anything.

2            *MR. HARVEY:* I can't tell anything, but he was

3    attributed a thousand kilograms. And Your Honor, I'm aware

4    that there was a jury finding that he was found guilty of at

5    least a hundred grams. So Your Honor, I -- while

6    acknowledging that finding, and I had a preamble--

7            *THE COURT:* It was for heroin, it was 1 kilogram or

8    more I think is what it was.

9            *MR. HARVEY:* I thought it was a hundred grams or

10   more?

11           *MS. TAYLOR:* He was convicted of a hundred grams or

12   more, I believe.

13           *THE COURT:* Okay. Well, I'm looking at a verdict

14   form.

15           *MR. HARVEY:* I've got the verdict form here, Your

16   Honor. On under--

17           *MS. TAYLOR:* On Mr. Pernell or Mr. Smith?

18           *THE COURT:* Maybe I'm looking at the wrong thing

19   then.

20           *MR. HARVEY:* Mr. Dunlap was found guilty of a

21   hundred grams or more of heroin.

22           *THE COURT:* Okay. I've got the wrong thing in

23   front of me, I guess. Okay. I'm sorry. I'm looking at the

24   wrong -- you're right. I'm sorry.

25           *MR. HARVEY:* So Your Honor, the -- again, it's...

1          THE COURT: Yeah, let's see. Okay. Yeah. Right.

2     I got ya. Okay.

3          MR. HARVEY: Okay. So Your Honor, the drug weight

4     calculation methodology is -- that's the gist of the drug

5     weight calculation objection, and the chart refers to its

6     inconsistent or unreliable application.

7          THE COURT: All right. But you're not arguing that

8     the reference to, thing, doesn't mean anything. You mean you

9     think it means an ounce?

10          MR. HARVEY: Right. Where again, Your Honor, the

11     chart references the difference between -- so when it says

12     388 grams are in question...

13          THE COURT: You think it should be 112 grams.

14          MR. HARVEY: Right.

15          THE COURT: Okay.

16          MR. HARVEY: So again, his position -- and again, I

17     know Mr. Dunlap would want me to ask the Court, remind the

18     Court there was a preamble in his sentencing objection that

19     this argument doesn't waive his prior objections and he's

20     preserving all of the issues that were raised with regard to

21     the trial, and so I just want Mr. Dunlap to understand that

22     this proceeding here is to ensure that he has the fullest and

23     fairest sentencing hearing possible and that's what we're

24     doing.

25          THE COURT: Okay.

1          *MR. HARVEY:* Thank you, Your Honor.

2          *THE COURT:* All right. Now, I'm going to hear from

3     Ms. Taylor on this first, but before I do that, let me ask

4     you, let's assume that I accept your argument that the word,

5     thing, refers to 1 ounce. So have I got to go through this

6     table and subtract out the excess between the weight in

7     question and then the gram, the number that's--

8          *MR. HARVEY:* I have done that already, Your Honor.

9          *THE COURT:* Okay. All right. Good, because maybe

10    your math is better than mine.

11         *MR. HARVEY:* Well, my math isn't so hot, but...

12         *THE COURT:* Okay.

13         *MR. HARVEY:* I'm -- thank you for the compliment,

14    but be sure you think about it before--

15         *THE COURT:* What would the cocaine weight be if I

16    accepted your argument?

17         *MR. HARVEY:* 1116.8 grams.

18         *THE COURT:* I'm sorry. Say that again.

19         *MR. HARVEY:* 1116.8.

20         *THE COURT:* Okay. All right. Thank you. All

21    right.

22        Ms. Taylor, why do I need to not worry about that?

23         *MS. TAYLOR:* Your Honor, as you recall, Agent

24    Greenan testified at trial, and this was -- he testified

25    about the wire calls and his and other agents' methodology

1    for determining what the nature of the calls were and

2    testified about codes and such and, yes, we agree the law is

3    that you should be applying methodology consistently.

4         That does not mean that the word, thing, has to be

5    applied consistently.  It has to be applied in context.

6              *THE COURT:*  In context with the previous and the

7    following--

8              *MS. TAYLOR:*  Following calls, but also who the

9    players are that we're talking about on the calls.  And in

10   this case that one call that he referred to was a discussion

11   between Mr. Smith and Mr. Dunlap talking about the guy

12   coming, the man coming.  I don't remember the use, but that

13   was the supplier coming.  Kevin Mullins, if you will recall,

14   was the one who would deliver on behalf of Pernell to

15   Mr. Smith.

16        So when we're talking about the deliveries made by

17   Mr. Pernell, we're talking about -- or Mr. Mullins, we're

18   talking about a larger quantity.  When we're talking about

19   drugs that are picked up by Mr. Stacey Fuller from Mr. Dunlap

20   to deliver to a customer, a thing is a smaller amount.

21        So, a thing may be a kilo in the context.  A thing down

22   here may be a cookie, an ounce of crack.  If we went down

23   further, a thing may be a gram.  A thing is just a word

24   that's used in the context.  It does not have a meaning in

25   and of itself.

1    And they derive their drug weights going through,

2  conservatively, through the wire calls, the ones preceding,

3  the ones that are following, they looked at the cooperating

4  statements of the various witnesses involved, those that were

5  doing the big drug weights, those that were doing the smaller

6  drug weights down here, and so we do believe and we think

7  that the testimony and the fact that the jury found them

8  guilty based on Mr. Greenan's testimony and on those wire

9  calls shows that the methodology was applied fairly and

10  consistently and that you can't pick apart one word and say,

11  if it means an ounce here, it means an ounce there.

12        THE COURT:  Right.  So your argument is that,

13  thing, has a different meaning depending on who the

14  conversation is occurring between and also the context of the

15  call itself.

16        MS. TAYLOR:  Correct.

17        THE COURT:  Okay.  I understand.  All right.

18  Anything in reply?

19        MR. HARVEY:  Your Honor, again, conversation 7335

20  is utilized in the presentence report solely, there's no

21  reference.  Ms. Taylor's response talked about context, but

22  there's no context in the presentence report.

23    I cited -- so, we're not saying it's just -- it's just

24  too indefinite.  And when there's uncertainty, I believe I

25  cited some authority if there's uncertainty, that the

1    application or the Court's determination of the drug weight

2    should be to the benefit of the defendant.

3        So with the heroin weight, if that was in fact about a

4    transaction, it's speculative who the man was or who the boy

5    was because that's also used in other transaction -- hey, my

6    man's coming -- those are just generic terms.  There's no

7    indication that that vernacular indicates with specificity or

8    even a preponderance in the instance of this conversation

9    that that's a kilogram supply.

10       If let's -- so it is just so vague to be unreliable.

11   And Your Honor, thank you.

12            THE COURT:  Okay.  All right.  Anything in response

13   to that?

14            MS. TAYLOR:  No, Your Honor.

15            THE COURT:  Okay.  All right.  I think that based

16   on the testimony that we heard at trial about this and the

17   context of these, these calls, which I agree in and of

18   themselves are very difficult to understand -- we had a lot

19   of different people on different conversations about

20   different drugs and about different quantities, but I think

21   the testimony from folks who are familiar with this language

22   and who have thoroughly reviewed the totality of the calls,

23   paying attention to the parties to the call, the vernacular

24   that is used in reference to and in the context of previous

25   and subsequent calls, I'm convinced that it's more likely

1    than not that what was referenced is accurate according to

2    the presentence report, so I'm going to overrule the

3    objection.

4        All right.  I'd be happy to hear from you on your next

5    one.

6            MR. HARVEY:  Thank you, Your Honor.  And the next

7    objection is the drug quantity inclusion of Fuller drug

8    weight.  Your Honor, we had cited with specificity

9    indications from Mr. Fuller's debriefing that highlights what

10   clearly is animosity, ill will, and a bad relationship.

11           THE COURT:  I'm not sure I follow what you're

12   talking about.  I'm looking at objection number two about

13   possession of a dangerous weapon.

14           MR. HARVEY:  I apologize, Your Honor.  There was

15   still another --

16           THE COURT:  Oh, okay.  I'm sorry.

17           MR. HARVEY:  -- drug weight.

18           THE COURT:  Okay.  All right.

19           MR. HARVEY:  Your Honor, it's in page five of the

20   sentencing memorandum.

21           THE COURT:  Okay.

22           MR. HARVEY:  So Your Honor, his drug weight--

23           THE COURT:  Fuller drug weight, okay.

24           MR. HARVEY:  Because Mr. Fuller's drug weight --

25   Mr. Fuller's drug weight places his -- his base offense level

1   is 32.  Mr. Fuller's drug weight as crack cocaine gets --

2   without anything else, he's still at that base level.

3        So, Mr. Fuller testified at the trial.  Mr. Fuller

4   talked about getting circles from Mr. Dunlap.  Mr. Fuller's

5   debriefing is cited in the presentence report as the basis of

6   the crack cocaine weight that was utilized in the presentence

7   report.

8        I had cited with specificity again Fuller -- and they

9   had a relationship of animosity and mistrust.  Fuller was

10  aggravated with his interactions with Terrence.  That's in

11  the page 06372 of his debriefing.  He stated Terrence did not

12  like him.  He expressed his belief that Terrence was sneaky.

13  He further stated another individual believed that Terrence

14  was sneaking or stealing drugs.

15       The proffer interview demonstrates his aggravation with

16  Terrence, and their acrimonious and hostile relationship

17  undermines the reliability of the information he provided to

18  government agents.  So, many of the statements are

19  speculative and not founded on precise information.  Any

20  information provided by Fuller must be viewed in light of his

21  bias against Terrence, which underlies the reliability of his

22  information.

23       So, you know, we have trial testimony, we have a trial

24  verdict, and then we have the cocaine weight utilized in the

25  presentence report based on Fuller's proffer, which he did

1    not elaborate at trial.

2        So we have this dilemma of a witness providing evidence

3    about some drug weight, but we have got this just large

4    amount of cocaine, which when it's converted under the

5    guidelines -- and at the appropriate time I'll talk about the

6    one-to-one argument -- but it transforms his base offense

7    level to level 32 where if this amount were reduced or

8    comport with the trial testimony and utilizing a one-to-one,

9    it would lay a basis for a reduced offense level of three --

10   of 30.

11       And again, Mr. Fuller's statement must be viewed with

12   his stated acrimony toward Mr. Dunlap, so we believe this

13   information is not 100 percent reliable. Again, I'm

14   Terrence's advocate. I'm aware of what the trial testimony

15   was, so I want to balance my advocacy with the trial

16   testimony and I want to make sure that the Court understands

17   that Mr. Dunlap is not taking the position frivolously that,

18   no, there wasn't any mention of crack at the trial, but the

19   amount that we're using here is unreliable.

20       And if the amount were reduced based upon its

21   unreliability or referenced the trial amount, which was

22   circles, and circles certainly doesn't mean kilograms,

23   circles is a much lesser amount, then that -- the crack

24   weight should be reduced by the plural of -- to what the

25   plural of circles is. Thank you, Your Honor.

1          *THE COURT:*  Thank you.  All right.  Ms. Taylor?

2          *MS. TAYLOR:*  Thank you, Your Honor.  If you'll

3    recall Mr. Fuller, he's the individual who was an older

4    gentleman, was admittedly a crack head, someone who is

5    addicted to crack cocaine.  But he became involved with

6    Mr. Santerrio Smith in order to supply his habit, and he did

7    errands for Mr. Smith basically.

8          He did some work around the house for him and, more

9    importantly relevant to this, he picked up drugs and

10   delivered drugs on behalf of Mr. Smith and in exchange,

11   Mr. Smith, would provide him with small quantities of crack

12   cocaine for his own use.

13         Mr. Fuller testified at this trial.  I believe that the

14   jury found him credible.  There was no mention at trial that

15   I recall whatsoever about any acrimony -- and I believe that

16   word is a word that Mr. Harvey is using which is much

17   stronger than anything that Mr. Fuller would have conveyed to

18   agents.

19         I don't recall any evidence whatsoever that it was any

20   acrimony between the two.  Mr. Fuller testified that he would

21   go to Mr. Dunlap's residence at the behest of Mr. Smith, he

22   would pick up crack cocaine in circles -- circles, we believe

23   in a context of this case, would be an ounce, a cookie of

24   crack would be an ounce -- he would pick up the crack and he

25   would deliver it on behalf of Mr. Smith.

On occasion, one or two occasions I believe he testified that he actually picked up cocaine powder. He did not know why he was picking up powder, but he believed that perhaps the quality -- that Santerrio had run out and needed some cocaine on-hand instead of the crack. But Mr. Dunlap's role was to cook the cocaine into crack in large part and to store the cocaine for Mr. Smith.

So, Mr. Fuller's testimony was he went on numerous occasions -- I don't recall exactly what he testified to, but he would pick up quantities most times of crack cocaine on behalf of Mr. Santerrio Smith.

Now, he testified that on at least one, maybe two occasions, he was actually present when Mr. Dunlap cooked the cocaine into crack cocaine, and he told agents that he actually played with Mr. Dunlap's child while the crack was being cooked. So, no evidence that I see of any acrimony. But nevertheless, he did testify. He had an opportunity to be cross-examined by five lawyers. And at the end of it, the jury found him credible.

So, I just don't believe that there's any reason to reduce the drug weights that Mr. Fuller testified to. If you'll recall, because he was a user and not a dealer, he told us and he told the jury he didn't know a lot about weights, he didn't deal in ounces and kilos and what have you, but he knew circles because he was a crack user, and he

1    knew that that's what he was picking up were circles of

2    crack.

3         And I don't remember now the exact testimony, but he

4    estimated the occasions on which he picked up the crack, he

5    estimated the number of circles that he picked up, and he

6    talked about the number of circles that he saw Mr. Dunlap

7    cooking.  So we don't believe there's any reason to discount

8    his testimony based on Mr. Dunlap's objection.

9              *THE COURT:*  All right.  Anything else on this?

10             *MR. HARVEY:*  Again, Your Honor, you have someone

11   who is an admitted crack addict whose recollection would be

12   based -- it would be a retrospective on what he recalled

13   seeing and doing while he was in the throws of his addiction.

14        The statements cited in the objection come from

15   Mr. Fuller's characterization of Mr. Dunlap.  So again, Your

16   Honor, we have a personal bias, we have the extra layer of a

17   crack addict, and we have him saying, I don't know about

18   amounts but I know about circles.  And again, what we have

19   got is we've got this extrapolation of Fuller's drug weight.

20        So, if Fuller's drug weight is based on circles, it

21   seems that an addict who doesn't know about weight and his

22   testimony doesn't provide a reliable basis for the conclusion

23   of the amount of crack weight that is in the presentence

24   report.  Thank you, Your Honor.

25             *THE COURT:*  All right.  Thank you.

1          *MS. TAYLOR:*  I would add just one thing, Your

2    Honor.  So, we don't have to accept Mr. Fuller's testimony on

3    its face alone because the reason Mr. Fuller was indicted was

4    because of the evidence we had before Mr. Fuller's

5    cooperation.

6        So what I'm saying is we had calls in which we heard

7    conversations between Mr. Smith and Mr. Dunlap, conversations

8    between Mr. Smith and Mr. Fuller.  So we were able to deduce

9    those drug weights based on those wire calls.  And then what

10   Mr. Fuller later told us was consistent with what we were

11   hearing on the calls.  So we weren't just accepting it whole

12   cloth.

13          *THE COURT:*  All right.  Well, that's a very good

14   point.  And for all the reasons that the government has

15   stated, I'm going to also overrule that objection.  All

16   right -- or that portion of the first objection as it relates

17   to Mr. Fuller's statements being the basis for some of the

18   drug weights.

19        All right.  Now I'll be happy to hear from you on the

20   possession of a dangerous weapon.

21          *MR. HARVEY:*  Yes, Your Honor.  So that starts on

22   page six of the sentencing memorandum.

23          *THE COURT:*  Yes.

24          *MR. HARVEY:*  In essence, you heard about the

25   unreliability arguments of Mr. Fuller.  And we have -- and

this is a very unique firearm situation.  Fuller saw Dunlap

with a Glock one time in April or May of 2017.  Dunlap had

the pistol stored in the door of his BMW.  This was at

Santerrio's house on Bronx road.  Someone asked for Dunlap to

move his car, so Dunlap told Fuller to move it, gave Fuller

the key.  Fuller got in the car and saw a pistol in a door

pocket.

Now, how Fuller knows that Dunlap was the only occupant

of the car that day isn't fully articulated.  And he arrived

at Santerrio's house and he says that Dunlap allegedly came

there to pay Santerrio money or get more drugs, but he

doesn't say that.  So, he doesn't say he observed that.

Okay?  He just says Dunlap had come.

So, no other witness observed Terrence with a weapon

during, you know, in the investigation.  As I recall, there

wasn't any trial testimony about this because Fuller wasn't

asked about the gun at trial.

So when we want to -- if you take the government's

argument about trial and about evidence that was presented

and being able to have as it -- I guess the gist of its

argument was independently corroborate certain information,

the trial would have provided the opportunity to

independently corroborate this.

We have no trial testimony about the firearm.  We have--

THE COURT:  I mean, but we -- I mean, we sentence

1 people and enhance sentences on information that's not at

2 trial every day.

3      *MR. HARVEY:* I understand, Your Honor. But--

4      *THE COURT:* I mean, you know, it's like saying

5 that, well, you didn't ask about it at trial, so he wasn't

6 subjected to cross-examination on that so it shouldn't be

7 considered? I mean...

8      *MR. HARVEY:* No, I think it's a factor to consider.

9 I think when we look at all the issues related to this

10 particular enhancement, it's a factor to consider. Terrence

11 is in the house. Fuller in his statement doesn't provide

12 anything specific with what's going on in the house. You

13 just have this generic Terrence-was-there type of statement.

14 Nothing in particular.

15      Doesn't say that Terrence had access to the gun when he

16 was in the house. As I cited on page eight, you know, if

17 Terrence -- it would be different scenario if Terrence had

18 carried the gun into the house where activity was allegedly

19 taking place. That it was in storage in a location where

20 Terrence could not access if needed in conjunction with the

21 drug-related activity with the alleged-drug related activity

22 being conducted inside negates any inference that it was

23 present or possessed in conjunction with the drug trafficking

24 offense. Because it was inaccessible, it's clearly

25 improbable the weapon was connected to the offense.

1     Your Honor, I cited other cases where there have been

2    findings by courts that factually the relationship and the

3    presence of the firearm or the dominion and control of the

4    firearm or you have knowledge or somebody could provide to

5    the Court an indication that Terrence knew the firearm was

6    there, had dominion and control of the firearm.  We don't

7    know where the firearm was in the car.

8            *THE COURT:*  I thought it was in the--

9            *MR. HARVEY:*  In a compartment.  It says in a door

10   compartment.

11           *THE COURT:*  Door pocket.

12           *MR. HARVEY:*  It doesn't say what car he was

13   driving, what type of car he was driving, four doors, two

14   doors.  It's a lot, it's a lot of speculative information to

15   utilize to rely upon connecting a firearm with this

16   transaction.

17     The other cases that I cited have more definitive

18   factual scenarios.  I'm not saying that this -- an

19   enhancement of the -- excuse me -- a specific offense

20   characteristic of this type hasn't been applied in the

21   appropriate factual circumstance, but this factual

22   circumstance, this one instance of Stacey Fuller

23   speculating -- because the government can't tell you where

24   the gun was in the car, what type of car, what Terrence told

25   Stacey Fuller.

1    Stacey Fuller -- and Stacey Fuller, again, he's got some

2    speculative statement because he says it could have happened

3    in one month or the other, it happened on an occasion, but

4    there isn't enough specificity with that occasion and the

5    relationship of that occasion and Terrence with the firearm

6    to make it reliable.

7        So, I had -- statement, it doesn't reveal the precise

8    location of the door compartment with the individual.  How

9    does Stacey Fuller know Dunlap was the only person in the car

10   that day?  That's speculative.  And his limited observations

11   don't establish he had dominion and control over the firearm

12   or even had knowledge of its presence in the door

13   compartment.

14       We don't know.  It's found in a door compartment.  That

15   doesn't necessarily mean he was aware of it, he had seen it,

16   he had placed it there.  And so--

17           *THE COURT:*  But it's his car.  I mean, isn't that

18   a -- I mean, that's enough.  I mean, if there were a gun in

19   my car, I'd know about it.

20           *MR. HARVEY:*  Well, Your Honor, respectfully,

21   obviously I disagree in this instance.  It's not enough.  And

22   if we have two -- we have got two alternatives that

23   demonstrate the purpose of the visit was unknown to Fuller.

24   So, the information which the firearm enhancement is not

25   based upon sufficiently reliable information to establish the

1    specific offense characteristics.

2         Again, it's a unusual factual circumstance.  I have

3    cited factual circumstances that are different and I cited

4    the McCalister case, which we are all familiar with, Your

5    Honor.  So in this particular instance, this enhancement

6    certainly has a different factual context.

7         And the legal analysis applied to this context that's

8    cited in the sentencing memorandum supports the position that

9    this specific offense characteristic isn't supported by

10   sufficient reliable evidence because of these questions in

11   the legal authority that I cited to uphold this two-level

12   specific offense characteristic.  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.  All right.

14   Ms. Taylor?

15           MS. TAYLOR:  Your Honor, Mr. Harvey has

16   characterized Mr. Fuller's statement as speculative, but I

17   don't think there was anything speculative about it

18   whatsoever.  Mr. Fuller said that Mr. Dunlap was there alone,

19   having driven his BMW, that someone asked Mr. Fuller to move

20   the car.

21        Mr. Fuller got in the car and saw in plain view clearly

22   in the door pocket -- this was not a locked compartment.  He

23   didn't say compartment, he said door pocket.  And I think we

24   all know when we refer to a door pocket, we're talking about

25   just that.  There's a pocket inside the driver's side door

1   where you can see what's sitting in there.

2       He didn't rummage around to find it.  He said he got

3   into the car to move the car and he saw the gun in the door

4   pocket.  And he did talk about why he came.  He might not

5   have recalled whether it was to deliver drugs or to pick up

6   drugs, but he did say it was either to deliver drugs or pick

7   up drugs.  He didn't say for some unknown reason that it

8   could have been.  He said it was one of these two things.

9       And we know from the wire calls that Mr. Dunlap and

10  Mr. Smith had daily contact about drugs.  We know from the

11  wire calls that he went to Santerrio Smith's house to get

12  drugs, to pick up drugs.  We know -- we know that -- we know

13  they have a relationship, a family relationship.  But during

14  this, this was only a six-month time period that Mr. Fuller

15  was even involved with Mr. Smith and therefore involved with

16  Mr. Dunlap.

17      And so, to narrow it down to April or May is like saying

18  the spring or the early summer of 2017 -- I don't know that

19  we need him to give us a specific date, but he gave us facts,

20  unsolicited facts about on this one day, I saw a gun.

21      Now, if he were going to -- and admittedly, Your Honor,

22  he is the only one that talked to us about Mr. Dunlap having

23  a gun.  Perhaps that is because Mr. Dunlap didn't walk around

24  carrying his gun.  But Mr. Dunlap went to deal with

25  Mr. Santerrio Smith with a gun in the pocket of his car.  And

```
1    the case law is clear.  Mr. Dunlap is not permitted to carry
2    a gun.  He is a felon.  And the case law is clear that guns
3    are known to be tools of the drug trade.
4        So, based on the guideline enhancement which says that
5    you should apply the enhancement unless it is clearly
6    improbable that the gun was possessed in furtherance of the
7    drugs, I think -- I think that we have more than met our
8    standard of a preponderance of the evidence.
9            THE COURT:  All right.  Okay.
10           MR. HARVEY:  Excuse me, Your Honor.  If I may.
11   Need to correct one thing that you'll hear about.  His
12   criminal history comprises of two simple marijuana
13   convictions.
14           MS. TAYLOR:  I may have misspoken, Your Honor.
15           MR. HARVEY:  So, he's not -- he wasn't charged with
16   being a felon in possession.  Don't want to mischaracterize
17   or have anything that may cause Mr. Dunlap not to be viewed
18   objectively, so I wanted to correct that statement.
19           MS. TAYLOR:  I apologize, Your Honor.  My
20   recollection was he was a felon, but it is clear that he is
21   not based on the presentence report.
22           THE COURT:  Okay.  Well, so since that doesn't make
23   any difference for my decision on this, but that's noted for
24   the record.
25           MR. HARVEY:  And again, Your Honor, we have this
```

1    one -- we have already addressed Stacey Fuller and the issues

2    of who he is and his reliability and issues of that.  We also

3    have addressed the factual circumstance.

4         And again, this particular enhancement is based upon --

5    Ms. Taylor doesn't like my use of the word speculative, but

6    if there isn't a reliable underlying basis, the government is

7    asking the Court to utilize assumptions about things to

8    enhance or increase his already significant penalty.

9         So I would respectfully disagree with my colleague,

10   disagree with any negative connotation there may be with the

11   use of the term speculative because that's what the

12   government is asking the Court to do.  Thank you, Your Honor.

13            *THE COURT:*  All right.  Thank you.  All right.  I

14   think based on what Mr. Fuller explained about the presence

15   of the gun in Mr. Dunlap's car, particularly in light of the

16   fact that the relationships between Mr. Smith and Mr. Dunlap

17   and Mr. Fuller are pretty clearly established in those wire

18   calls that were recorded, I would be really -- I mean, it's

19   certainly not clearly improbable that that gun was somehow

20   related to the drug trafficking business that they were

21   engaged in, so for those reasons I'm going to overrule that

22   objection.

23         Okay.  All right.  Let's see.  All right.

24            *MR. HARVEY:*  Your Honor, the next objection is

25   maintaining a premises.  I would just -- I would rely on the

 1    argument that I submitted in the memorandum with respect to

 2    maintaining a premises.  I don't think any oral argument

 3    would supplement --

 4              *THE COURT:*  Okay.

 5              *MR. HARVEY:*  -- that.  I want Mr. Dunlap to

 6    understand that I presented and articulated the basis for

 7    that objection.  And I'll be happy to answer any questions,

 8    but I believe that has thoroughly set out the basis for the

 9    maintaining the premises objection.

10              *THE COURT:*  Yes.  I mean, I think I understand your

11    argument.

12         Now Ms. Taylor, do you -- since I haven't gotten

13    anything from the government on this, would you like to

14    respond to that?

15              *MS. TAYLOR:*  Just, Your Honor, I think that the

16    facts are all contained within the presentence report, but

17    they were also at trial, that Mr. Stacey Fuller went on a

18    regular basis to Mr. Dunlap's home to pick up drugs, that Mr.

19    Dunlap both cooked from cocaine into crack for Santerrio

20    Smith and stored for Santerrio Smith.  And in addition to --

21    and the wire calls obviously corroborated all of that.

22         In addition to Mr. Fuller's testimony, you had

23    Mr. Elijah Davis' testimony that prior to Mr. Dunlap being

24    the person who maintained the stash, basically, that Mr.

25    Dunlap had kept -- I mean Mr. Elijah Davis -- sorry about

1  that -- Mr. Elijah Davis was responsible for working for

2  Mr. Santerrio Smith and holding his drugs and keeping his

3  drugs for him, but that Mr. Davis was arrested and placed on

4  location monitoring, and so it was no longer safe for him to

5  be delivering drugs to and from, and so at that point the

6  stash basically shifted to Mr. Dunlap.

7        Trying to remember if there's anything else.  Is that

8  it?  So I think -- and clearly the calls throughout the wire

9  clearly indicate that Mr. Fuller was picking up drugs from

10 Mr. Dunlap, that he watched -- he testified that he watched

11 him cook crack at the house.

12        And clearly the law is not that the house has to be

13 maintained for the sole purpose of storing drugs or cooking

14 drugs but that it has to be one of the primary purposes.  And

15 we think at least during this time period after Mr. Davis was

16 placed on location monitoring, that he was in fact

17 maintaining a house for the purposes of manufacturing the

18 crack and storing the cocaine and crack.

19            *THE COURT:*  Thank you.  Mr. Harvey?

20            *MR. HARVEY:*  I'd just reiterate the argument and

21 the legal theory presented.  We think that the legal theory

22 presented with respect to the premises argument is persuasive

23 and that in spite of Ms. Taylor's articulation, the Court

24 should consider what we argued and not -- and sustain the

25 objection to that specific offense characteristic.  Thank

1    you.

2              THE COURT:  All right.  Well, I think it's pretty

3    clear that this was a stash house, so I'm going to overrule

4    that objection.

5         All right.  Now, let's see.  What do we have?  You

6    withdrew I think one of them.

7              MR. HARVEY:  Your Honor, there was an obstruction

8    of justice, a specific offense --

9              THE COURT:  Okay, and then--

10             MR. HARVEY:  -- characteristic that in view of what

11   happened in the companion case, 19-781, it was withdrawn.

12             THE COURT:  I'm sorry, I didn't hear--

13             MR. HARVEY:  In view of the guilty plea in the

14   companion case, the objection to obstruction of justice

15   specific offense--

16             THE COURT:  Okay.  That's the one you withdrew.

17   Okay.

18             MR. HARVEY:  Right.

19             THE COURT:  All right.  So what does that leave

20   here for the -- as far as your objections go?

21             MR. HARVEY:  Your Honor, that's the gist of the

22   objections.  I do have -- I guess after the Court reaches --

23   I don't know if the Court wants to go into the downward

24   departure motion or...

25             THE COURT:  Yeah.  Okay.  I believe if I have

         1    addressed all of the objections, then probably now I need to

         2    hear from the government about -- first I need to announce

         3    what the --

         4             *MR. HARVEY:*  Correct, Your Honor.

         5             *THE COURT:*  -- the report says.  All right.

         6        Mr. Mills has objections?  I'm sorry.  I didn't realize

         7    we were having -- okay.  I'm sorry.  Okay.

         8             *MR. MILLS:*  That's okay, Your Honor.  I...

         9             *THE COURT:*  You had an objection for an adjustment

        10    for acceptance of responsibility?

        11             *MR. MILLS:*  Correct.

        12             *THE COURT:*  Okay.

        13             *MR. MILLS:*  Your Honor, and of course, just place

        14    this in context for the record, this was a jury tampering

        15    charge to which he pled guilty.  There was a plea agreement

        16    done at the time that he entered this, and at the time it was

        17    understanding that he would be accepting responsibility for

        18    that claim, and of course, that has resulted in him

        19    withdrawing his objection to that claim in his companion case

        20    that is represented by Mr. Harvey.

        21        Your Honor, just in looking at this case -- the way I

        22    tried to talk about it is like two separate silos that I'm

        23    representing on one charge and Mr. Harvey is representing on

        24    another, but for sentencing purposes those silos are kind of

        25    getting merged.

1          *THE COURT:*  Yes.

2          *MR. MILLS:*  It's not, quote, concurrent sentencing

3    because you're -- they are -- and that's one of the dilemmas

4    I'm going to have with the Court is I can make an argument

5    and want to make an argument about why he deserves less than

6    a guideline sentence or what the PSR recommends here, but

7    since it's tied to the other case, in other words, it's

8    always got to be six levels lower than that offense, kind of

9    my starting point is going to be what you're going to do with

10   Mr. Harvey's case setting that offense level.

11         But let me address just the specific objection at this

12   point if I could, please.  And let me also indicate that my

13   understanding is Mr. Dunlap is going to be appealing his

14   conviction on a direct appeal in the trial.  If that is

15   reversed on appeal, then whatever happens here, I think he'll

16   have to be resentenced on this jury tampering charge because

17   it is -- the guideline is set in relationship to that

18   conviction.

19         If that conviction is gone, he does not have a

20   cross-reference that takes him up into the 30s.  He would be

21   down around a -- I think his base offense level is 17 or his

22   base level offense 14, three because happened during the

23   course of a criminal trial.  So regardless, and so if that's

24   reversed, he would have to come back and be sentenced.

25         Dealing with it as it is today, he has a guideline

1    sentence of 30.  And of course, he did accept responsibility.

2    It's consistent with what he did, withdrawing his objection

3    in that case.  I understand the probation's position that he

4    has to accept it on all, but there's nothing more he can

5    accept in the case that I represent him on.  And I think that

6    should be considered in establishing his calculation under

7    that sentence.

8         And under those circumstances I think he should get a

9    three-level deduction and should be at an offense level of --

10   excuse me -- of 27 as opposed to 30 as a starting point.  I

11   have other arguments that may go to variances, but I just

12   want to keep this argument focused on the objection.

13        *THE COURT:*  So basically you're arguing that this

14   is one of those extraordinary cases where I should allow

15   acceptance of responsibility.

16        *MR. MILLS:*  I have been practicing for 35 years.

17   It's the first one I have ever dealt with like this.  So,

18   it's extraordinary to me and it does seem unique.  And I

19   think it's important also that he did accept responsibility

20   on this serious issue and does deserve credit even if it may

21   not ultimately make a difference in his long-term sentence,

22   on this sentence that he did, making a decision for the

23   Court, avoiding a jury trial, avoiding putting the government

24   to the proof, and should get credit for that.

25        *THE COURT:*  All right.  Thank you.

1          *MR. MILLS:*  Thank you.

2          *THE COURT:*  All right.  Ms. Taylor?

3          *MS. TAYLOR:*  Your Honor, as first matter, the Court

4    is not required to rule on objections that do not affect the

5    sentencing calculation.  We do acknowledge that Mr. Dunlap

6    ultimately accepted responsibility on this charge by pleading

7    guilty.  And if in the event that his other conviction is

8    overturned, he will be back before this Court --

9          *THE COURT:*  Will be back here.  Right.

10          *MS. TAYLOR:*  -- and whether or not acceptance

11   applies at that time will be decided at that time.

12          *THE COURT:*  All right.  I agree with the

13   government.  I don't think at this point a decision needs to

14   be made on that.  If the conviction on the drug trafficking

15   charges are reversed and we are sent back here to resentence,

16   then you'll be free to argue whatever you want to argue about

17   it at that time.

18       All right.  So, that brings us now to me adopting the

19   findings because I believe now I've resolved all of the

20   objections to the report.  So I will adopt the findings that

21   are set forth in the presentence investigation report

22   including the applicable statutory and guideline provisions

23   that are set forth in it for purposes of determining the

24   reasonableness of my sentence.

25       And I -- this is something that I'm having to add into

1    these things because, well, everything I do because of what

2    the Fourth Circuit has told me I have to do.

3        But I want to ask the lawyers if they have been over the

4    mandatory and standard conditions of supervision that are

5    outlined in the report with Mr. Dunlap.

6        (Mr. Harvey conferring with client.)

7        *MR. HARVEY:* Your Honor, I have met with Mr. Dunlap

8    several times. Mr. Dunlap has had the opportunity to review

9    his presentence report in its entirety. I have questioned

10   him repeatedly, has he gone over the report in its entirety.

11   His answers have been to the affirmative. He is aware of all

12   the content.

13       And we also talked about the fact that he would be on

14   supervised release, and I explained to him that the

15   presentence report contained what would be -- what the

16   conditions of pre -- excuse me -- not pretrial release, but

17   supervised release. I was being optimistic about him coming

18   back to see you.

19       So, Your Honor, again, Mr. Dunlap, based on our

20   conversations, is aware of the terms of his supervised

21   release.

22       *THE COURT:* Okay. Mr. Dunlap, I just want to make

23   sure because just like with the rest of the PSR, if you want

24   to lodge an objection about it, you would have to do that

25   now.

1          *THE DEFENDANT:*  Yes, ma'am.  I understand all the

2     terms.

3          *THE COURT:*  What did you say?

4          *THE DEFENDANT:*  Yes, ma'am, I understand all the

5     terms.

6          *THE COURT:*  Okay.  All right.  Thank you.  Well

7     then, counsel having affirmed, responded affirmatively, I'm

8     going to incorporate that also into any sentence that will be

9     imposed.

10         All right.  Mr. Dunlap, sir, if you'd stand, please.

11    All right.  The statutory provisions for your offenses are as

12    follows:  First, your first offense is Count One, which is

13    conspiracy to possess with intent to distribute and to

14    distribute 5 kilograms or more of cocaine and 100 milligrams

15    or more of heroin.

16         Your second offense, Count 22, is use of a

17    communications facility in furtherance of a drug trafficking

18    crime.  And your third is set forth in Count 49, which is

19    possession with intent to distribute and to distribute a

20    quantity of crack cocaine.

21         Now, for Count One -- is there something you wanted

22    to -- sorry.  It was Count One.  Your second offense was

23    Count 21.  I am not sure what I said, but it's Count 21.

24         All right.  Now, as far as what the punishments are for

25    those offenses, for Count One, the statutes impose a sentence

1    of 10 years to life.  For Count 21, it's not more than four

2    years.  And Count 49, it's not more than 20 years.

3         As far as the supervised release that would follow a

4    sentence for these offenses:  For Count One, it's a period of

5    at least five years; for Count 21, it is not more than one

6    year; and for Count 49, it is at least three years.

7    Probation is precluded by the statute.

8         Count One carries a fine of $10 million.  Count 21, a

9    fine of $250,000.  And Count 49, a fine of $1 million.  And

10   then there is a special assessment fee for each count of a

11   hundred dollars, so it would be for a total of $300.

12        Now, as to the jury tampering charge that's set forth in

13   Count One of the 3:19-781 case, the statutes provide for jury

14   tampering, custody of not more than 20 years.

15        Mr. Mills, did you have something that you wanted--

16             *MR. MILLS:*  No, Your Honor.  I'm sorry.  I just...

17             *THE COURT:*  Okay.  Not more than 20 years, followed

18   by supervised release of not more than three years.  It is

19   ineligible also for probation.

20        The jury tampering offense carries a $250,000 fine and a

21   $100 special assessment fee.

22        So, those are the statutory provisions for your offenses

23   that are applicable.

24        Now, the advisory sentencing guidelines assign to Count

25   One that -- let's see.  Not sure if these -- Okay.  All

right. I'm sorry. Okay. The advisory sentencing guidelines combine Count 41 and Count 49 and assign them a base offense level of 32. And as you heard, there was a increase because of a specific offense characteristics, that was your possession of a dangerous weapon that increases that 32 by two levels.

As you also heard, there is an additional two-level increase because you maintained a stash house.

There is a final increase because of your adjustment -- I mean, excuse me -- for your obstruction, which was willfully obstructing or impeding or attempting to obstruct or impede the administration of justice. So your total offense level for that count, those counts is 36.

Now for Count 21, the guidelines assign that offense a base offense level of 36. Again, that is increased two levels for obstructing justice, so the adjusted offense level for that count is 38.

*PROBATION AGENT:* Make a correction. The adjusted offense level for Counts One and 49 is I believe you said 36. I believe it's 38. Want to make sure.

*THE COURT:* Let's see. I have Count One and I have Count 49. And you say it's not 49?

*PROBATION AGENT:* Sorry, Your Honor. It's Counts One and 49 the adjusted offense level is 38.

*THE COURT:* Oh, okay. I apologize. Because that

1    would be 32, 34, 36, so that would leave you with an adjusted

2    offense level of 38.

3         Now, for Count 21, which is use of a communication

4    facility in furtherance of a drug trafficking crime, the

5    guidelines assign that an offense level, base offense level

6    of 36.  Again there's a two-level increase for obstruction of

7    justice, so there's an adjusted offense level for Count 22 of

8    38.  Excuse me -- 21 of 38.

9         Now, let's see.  For the jury tampering case, the Count

10   One, the single count, the guidelines assign that a base

11   offense level of 14.  That number is increased three levels

12   because of your interference with obstruction of justice.

13   There is a cross-reference with the others that makes the

14   offense level 30, and that along with the other that I just

15   read combined for an offense level of 38 because it's the

16   higher one.  So you have a total offense level on the jury

17   tampering for 38.

18        Now, your criminal history category has been determined

19   to be a two.  In that situation, the guidelines yield an

20   imprisonment range of 262 to 327 months followed by

21   supervised release for a period of five years for Count One,

22   one year for Count 21, and three years for Count 49.

23        Okay.  For the second case, 3:19-781, the supervised

24   release period is one to three years.  Probation is precluded

25   by statute.  We have not calculated a fine, but there's a

1    total of four counts with a hundred-dollar special assessment

2    fee, so that would be $400.  All right.

3          Sorry that was a little confusing, but that's how I see

4    the applicable statutory and guideline provisions here.

5          Are there any comments or corrections?

6                *MS. TAYLOR:*  Not by the government, Your Honor.

7                *MR. HARVEY:*  No, Your Honor.  Just so Mr. Dunlap

8    and his family understands, procedure at this point is the

9    Court has announced the calculations --

10               *THE COURT:*  That's right.

11               *MR. HARVEY:*  -- of the guidelines after taking in

12   consideration and ruling on the objections.

13               *THE COURT:*  Correct.

14               *MR. HARVEY:*  So the Court's calculation of the

15   offense level is correct considering it's not sustaining the

16   objections.

17               *THE COURT:*  Right.

18               *MR. HARVEY:*  So I just wanted Mr. Dunlap to

19   understand where we are in the proceeding.  Thank you, Your

20   Honor.

21               *THE COURT:*  Okay.  And it is a little confusing.

22   The presentence report, we've dealt with the objections.  And

23   given the way I ruled on the objections, we have to calculate

24   the guidelines, and I -- that's what I was doing.  I was

25   calculating the guidelines and I was just -- I believe they

1   are correct, and so we haven't had any objections to that and

2   there couldn't be because that's what the guidelines -- the

3   guidelines provide.  It's simply just like when I stated what

4   the statutes provide, that's what they provide.

5        Now, we'll get to another phase of this in a moment

6   where we will discuss whether or not the guidelines

7   calculation or the ranges there are appropriate.  Okay?  So

8   that's the next part of this sentencing, and we'll get to

9   that in just a moment.

10       All right.  So you can be seated.

11       All right.  We have -- Mr. Mills, you didn't have

12  anything you wanted to -- I noticed you were standing a

13  moment ago and I just want to make sure I wasn't cutting you

14  off.  Okay?

15           *MR. MILLS:*  No, I'm fine, Your Honor.

16           *THE COURT:*  All right.  Well, we have those

17  calculations, we know what the statutory parameters are.  Let

18  me hear from the government.  I know the government has seen

19  Mr. Harvey's filing.  Would you like to go first?

20           *MR. HARVEY:*  Your Honor, we're at the phase where

21  now the Court must consider his downward departure motion

22  based on criminal history.

23           *THE COURT:*  Right.

24           *MR. HARVEY:*  So...

25           *THE COURT:*  Okay.

1          *MR. HARVEY:*  If Your Honor please, I would again

2    incorporate by reference the argument presented in the

3    sentencing memorandum.

4          So, we have Terrence Dunlap whose criminal history is

5    category two based upon two simple possession of marijuana

6    convictions.  If we look at the purpose of the guidelines,

7    and the guidelines, the -- the guidelines came about in order

8    to assure uniformity in sentencing and to make sure that

9    there wasn't a disparity amongst defendants based upon many

10   factors, one is which -- one of which is criminal history.

11         So the guidelines in chapter four talk about a specific

12   basis for a departure if we have an over-represented criminal

13   history.  So we have someone who has two simple possession of

14   marijuana convictions.

15         As I cited in the sentencing memorandum, had Mr. Dunlap

16   been a resident of California, these wouldn't have counted.

17   I know he's not a resident of California, but when we look at

18   the purpose of the guidelines, when we look at the goal to

19   have a uniform treatment of offenders, the simple possession

20   of marijuana convictions elevate his criminal history by a

21   category.  Were he in another location, those wouldn't be

22   counted.

23         So it seems that -- and also this kind of ties in to

24   where we'll go with the sentencing factors, but the probation

25   office did a very thorough presentence report and it

1    indicated in its interview with Terrence, Terrence had a

2    substance abuse issue.  He was addicted to marijuana.  So we

3    have these offenses that clearly are related to, you know, an

4    issue that Terrence was afflicted with.

5         When we look at -- when we look at the nature of the

6    sentences, there were sentences, and no one challenged the

7    validity of the conviction.  And I acknowledge the

8    convictions are there, but they are very minor in nature.

9         So, in 2022, given the flux of the perspective on

10   marijuana laws and what to do about marijuana, which is in a

11   national debate -- and I'm not articulating or taking a

12   position on the wisdom of a particular law, but I do think

13   it's fair that I counsel the Court on behalf of Terrence in

14   this instance.

15        These two simple possession of marijuana convictions

16   overstate his criminal history.  And if Your Honor were to

17   vary or grant a downward departure to criminal history

18   category one, it provides some relief for Terrence because,

19   Your Honor, I have a sentencing table here in --

20             *THE COURT:*  There we go, 235 to 293.

21             *MR. HARVEY:*  -- 235 to 293, which is significant.

22   And Your Honor, again, the guidelines call for this.  Now,

23   it's kind of funny you have a lawyer arguing in front of you

24   what the guidelines call for and then later on I'm going to

25   say the guidelines are advisory, but Your Honor, I -- and I'm

1    not trying to be--

2              THE COURT:  Consistency is no problem.  No problem.

3              MR. HARVEY:  I just -- that was just an editorial

4    comment.  But I believe in this instance, the guidelines

5    sometimes impart wisdom to us.  Not always, but in this

6    instance the guidelines, when they were formulated,

7    particularly recognized a circumstance like this.  And to

8    treat him as a category one offender, I think when Your Honor

9    looks at all the purposes and all the competing interest in

10   this case, including the government's interest, including the

11   interest of justice, those interests won't be harmed by

12   treating Mr. Dunlap as a category one criminal history

13   offender.  Thank you.

14             MR. MILLS:  Your Honor, if I might just add to what

15   Mr. Harvey has said just in joining that request.  The

16   reality is that's a two-and-a-half year increase in his

17   sentence based on two minor offenses which at most would

18   carry 60 days under South Carolina law.

19        So if we really want to translate what those two minor

20   offenses are doing, he's getting two and a half years for it.

21   That's a lot for simple possession of marijuana.

22             THE COURT:  All right.  Thank you.  All right.

23   Ms. Taylor?

24             MS. TAYLOR:  Your Honor, we do not believe that

25   they've articulated a basis for a departure in this case.

1    Mr. Dunlap is not being treated any differently than any

2    other individual who has been arrested for two counts of

3    simple possession.

4        The guidelines provide for a point for these minor

5    offenses, if it's simple possession or shoplifting or what

6    have you.  And I think even -- I think these occurred in

7    2014, if I recall.  Even in the great state of California I

8    don't think it was legal to possess marijuana back in 2014.

9    But even so, it was illegal here.

10        I think that the guidelines provide for a departure when

11   the criminal history does overstate the criminal past of the

12   defendant.  And I would use as an example a situation where

13   someone may be a career offender because they have had two

14   prior bar fights, basically two charges, two convictions for

15   assault and battery that could be a bar fight and nothing

16   more, and now their guideline, their criminal history goes

17   from a one or a two to a six, but that's not the case here.

18        He's only gone from a one to a two.  And there's nothing

19   about his convictions that set him apart from any other

20   defendant that's similarly situated.

21             THE COURT:  All right.  I agree with the

22   government.  There's nothing unusual about this.  And it was

23   simple possession of marijuana and that's why it was a single

24   point.  So I don't think it's substantially overstating your

25   criminal history, so I'm going to deny the motion for a

1    downward departure.

2       All right.  So now we -- still we're left with the same

3    guidelines range.  So let me hear from the government about

4    what is an appropriate sentence for Mr. Dunlap given all of

5    these things.

6       *MS. TAYLOR:*  Your Honor, we do clearly believe that

7    a guideline sentence is appropriate in this case.  We know

8    that Your Honor has been inclined to give some defendants who

9    have shown remorse for their reactions a slight variance even

10    after trial, but in this case we have a defendant who

11    committed an extraordinarily serious offense to start with

12    and then during the course of his trial on that charge

13    committed what I think is one of the most serious offenses I

14    have ever prosecuted.

15       *THE COURT:*  I agree.

16       *MS. TAYLOR:*  And so I just can't imagine that this

17    is a defendant who is entitled to a sentence below the

18    guideline range in this case.  So we would just -- based on

19    all the factors under 3553, we would ask for a sentence in

20    the guideline range.

21       *THE COURT:*  All right.  Mr. Harvey?  You would like

22    for me to vary down from that range?

23       *MR. HARVEY:*  Yes, Your Honor.

24       *THE COURT:*  Tell me why.

25       *MR. HARVEY:*  Well, Your Honor, let's talk about the

1  sentencing factors as they apply to Mr. Dunlap.  One is Mr.

2  Dunlap's age.  He's a young man.  I cited in the presentence

3  report he's got a close relationship with his family.  He's

4  also a father.  He also -- he has maintained stable

5  relationship with the mother of his child.  He's -- to the

6  extent he can, he's tried to be involved in his child's life.

7      As Your Honor knows, over the course of the case,

8  Terrence lost his father.  Terrence was unable to bring

9  closure to the loss of his father.  And we tried to get him

10  released to be able to participate in a funeral and reach

11  closure with his family in a traditional fashion.

12      Your Honor, Terrence demonstrated a good work ethic.

13  And I think when Terrence puts this matter behind him in

14  whatever fashion that takes, he's demonstrated good personal

15  characteristics.

16      Your Honor, and one of the concerns that I know the

17  Court has and that the sentencing factors and the purposes of

18  sentencing look at is deterrence and protection of the

19  public.  I cited in the sentencing memorandum that Terrence

20  is a young man who's looking at a sentence that could be for

21  a considerable period of time.

22      The sentencing commission has found that as people

23  age -- and if Your Honor sentences him within the guideline

24  range, he will have aged substantially.  And if Your Honor

25  sentences him and varies from the guideline range to a

sentence that may comport with co-defendants who went to

trial or other co-defendants who are similarly situated, it

will still be a substantial sentence.

Also, Your Honor, the commission has found on the issue

of deterrence and protecting the public that recidivism

decreases with sentences over 120 months.  So we have a

statutory mandatory minimum of at least 120 months in a case,

so we have Mr. Dunlap, even if the case was -- excuse me --

if the sentence was varied to the statutory minimum, the

guideline has found that if you vary to that minimum, that

sentence correlates with decreased recidivism.  That's the

sentencing guidelines.

Your Honor, again, you heard the argument about criminal

history.  Your Honor, he has got -- the simple possession of

marijuana convictions accelerate his sentence substantially

to category two.  Those two simple possession offenses

substantially we contend and still contend you can look at in

the context of sentencing factors overstate his criminal

history and that overstated criminal history which arose from

the characteristic of him having substance abuse issues

because he was candid with the presentence report.

And in the presentence report he talked about his

marijuana addiction.  So we have a young man who has a

substance abuse issue, which isn't the sole cause but is a

contributing cause and a factor for you to consider, not only

1  contributed to what we contend to be an overstated criminal

2  history but also contributed to the underlying conduct.

3      I believe a salient issue is sentence disparity amongst

4  co-defendants.  Okay.  But what we know, the presentence

5  report clearly indicated that Terrence was an underling.  And

6  I set out on page 18 of the memorandum and referred to the

7  portions of the presentence report that talked about Terrence

8  being an underling for Santerrio Smith.

9      And his position, we didn't seek a minor role departure,

10 we didn't come before the Court seeking those kind of

11 departures because sometimes clients don't understand why

12 lawyers do things, but in this instance we need to focus on

13 what is there and what is sustainable.  And so, no one is

14 saying Terrence played a minor role, but it's clear in this

15 instance Terrence was an underling and he was an underling to

16 the Smiths.

17     And we have also, when we look at equally-culpable

18 co-defendants, he didn't share in a larger fruit of the

19 crime.  When we look at what was forfeited in what

20 co-defendants who forfeited a lot more money, a lot more

21 fruits of the crime, their sentences were different.

22     And when we -- we cited Donald Robinson.  He had cash,

23 firearms, expensive jewelry.  He got 180 months.  James

24 Green, who had $28,000, a substantial amount, substantial

25 amount -- I don't know if his presentence report extrapolated

that cash amount to what drugs were, but I imagine it's a

substantial amount.  He got 937 days.

So Terrence goes to trial.  He exercises his right to

trial.  Do not believe Terrence should be treated unfairly

for him exercising his right to trial.  And we know

similarly-situated defendants who are found guilty at Count

One, Whitney Pernell got 135 months.

I don't know and I can't recall her criminal history,

but it can't be -- if her -- if Terrence's criminal history

is two simple possession of marijuana convictions, her

criminal history could be equally benign or greater, and she

goes to trial, she's an underling to speak of in the context

of the case.  And Ms. Ford, same argument.  She gets 135

months.

Now, Glenn Pernell and Santerrio are distinguishable

from Terrence both in role, in conduct, and criminal history.

So this case, to avoid a disparity between defendants in the

case with similar criminal history and similar conduct, we

believe the sentencing factors require a variance.

Also, Your Honor, I had cited the sentence disparity

based upon guideline findings.  The guidelines -- and I also

cited in the memorandum the Supreme Court has recognized the

unique role of the sentencing commission and its importance

in it gathering data and helping -- both help courts,

prosecutors, defense lawyers on what its findings show in

1   reference to similarly-situated defendants.

2       So, I ran an information search based upon criminal

3   history two defendants who have been convicted of cocaine,

4   heroin, and crack drug trafficking offenses.  So we have

5   similarly-situated defendants in a broad universe and

6   similarly-situated defendants in the -- in his case.

7       In the broad universe, I cited what the average

8   sentences were, and that was just an indication to the Court

9   what the average sentences were, but I'm not asking Your

10  Honor to vary to the average sentence because you can't.

11  He's got a statutory mandatory minimum.  But I wanted Your

12  Honor to see the universe of sentences for similarly-situated

13  defendants.

14      The last chart was the sentencing commission's

15  information for similarly-situated defendants, what

16  percentage were sentenced within the guidelines, what

17  percentage received a non-government variance motion.

18      And the methodology I applied, I took the average of the

19  last three years, and it shows that non-guideline

20  sentences -- or excuse me -- within-guideline sentences

21  occur, but they don't occur over half the time.  Almost a

22  quarter of the time for the past three years for

23  similarly-situated defendants as Mr. Dunlap, non-government

24  variance motions have been granted.

25      So what that says to me in my interpretation of that is

for Your Honor to do a variant sentence in this case isn't an

anomaly.  Nationwide it's almost 25 percent of the time.

So when we look at sentencing factors, we have got the

defendants in the case, we have got the broad universe of all

defendants, we have got the length of sentence, we have got

the fact that his aggregate sentence includes supervised

release, so there's a mechanism to deter him, protect the

public, avoid sentencing disparity.

And Your Honor, I would just incorporate by reference

his personal characteristics and those other issues.

And another issue is the one-to-one crack variance

ratio.  Your Honor, we articulated in the sentencing memo the

propriety of using a one-to-one crack ratio.  We understand

that there's been some remedial effort with the one-to-18

ratio, but it still creates a big disparity.

Your Honor, in this instance we also cited a recent

congressional action that's pending in front of the senate

judiciary committee that recognizes there is a consensus that

something needs to be done with regard to the sentencing

disparity.  So if we utilize the one-to-one ratio, it may --

it would impact his sentence.

So, in essence, Your Honor, we have a sentencing factor

argument that I have articulated, we articulated the

one-to-one ratio.  And Your Honor, when you look at the

totality of circumstances that he is a young man with a child

 1    with a minimal criminal history, and he has shown some growth

 2    in development since his case ended.

 3        He's accepted responsibility in a subsequent case.

 4    Acceptance of responsibility is an indication of commitment

 5    to development and change, and I think that's a substantial

 6    factor in his behalf as well.

 7        And since the congress has mandated that we impose a

 8    sentence that's no greater than necessary when looking at his

 9    status in the case, when looking at the broad universe of

10    offenders, looking at offenders in his case, looking at what

11    the commission says about length of sentences and recidivism,

12    and taking into account his personal characteristics, I'm

13    sure that after the Court has given close attention to

14    everything that was presented to it, it will agree with me

15    that the sentencing factors counsel towards a non-government

16    variance sentence -- variant sentence which is substantially

17    less than the guideline sentence.  Thank you, Your Honor.

18            THE COURT:  All right.  All right.  Mr. Harvey has

19    said a lot.  Is there anything that you want to respond to?

20            MS. TAYLOR:  Just a few things, Your Honor.  So, I

21    do agree that Mr. Dunlap, which is somewhat unusual in my

22    cases, does not have a serious prior record, but that is as

23    far as I can see really the only factor that weighs in favor

24    of a sentence outside the guidelines.

25        When I look at the presentence report, I look at the

personal history of this defendant and I see a young man who

dropped out of high school, and the only -- Mr. Harvey

mentioned his work ethic. The only work that is reported in

the presentence report began after he was arrested on these

charges, if you'll note. And he had three jobs during that

time, each for a short period of time, just a matter of

months. Less than a year on in each case. So as far as I

can see, the most consistent work he ever did was selling

drugs. And it's a shame that that's where we are.

I'll also mention to the Judge, to the Court, Your

Honor, that you may not be aware that initially we took down

this case, we arrested everybody. Mr. Dunlap remained a

fugitive for some time. Despite that, he was released on a

bond, but the government asked that he be detained and he was

not.

Talking about the fact that he is a father, I don't want

to second-guess whether or not he is a good father in other

respects. But I bring to the Court's attention the fact that

he had a young child, a baby, in his home where he was

storing drugs and cooking crack cocaine.

THE COURT: I recall that.

MS. TAYLOR: And then finally, Your Honor, the

fact -- I can't even touch on it enough the fact that he and

his family decided that -- basically an assault on the

judicial system in having approached a juror who was sitting

1    in a trial. It's one of the most egregious crimes that I

2    have ever had to prosecute and I will say the only time I

3    have ever had a case as such in 27 years of federal

4    prosecution, 29 if you count my state prosecution. Never had

5    a case like that.

6    So, I just can't stress how serious I think that offense

7    is. But it also to me demonstrates his aptitude for

8    recidivism. He's arrested, he's under very serious charges,

9    he's on trial for his life, and yet he commits another very

10   serious offense.

11   So, we don't think that this is a case that's even a

12   close call for whether a variance, a downward variance

13   applies. This could have, on the other hand, been a case

14   where the government may move for an upward variance. You

15   know, I recognize that Mr. Harvey was treading very lightly

16   and not trying to diminish too much Mr. Dunlap's role in this

17   offense, but I would consider him to have had a vital role in

18   this offense.

19   Mr. Smith, Mr. Santerrio Smith, was under court

20   supervision and could not deliver drugs and so could not have

21   drugs in his home on a regular basis, and so he employed this

22   man to make certain that his operation continued. So, we'll

23   sit down at that and we would ask that the Court consider a

24   sentence within the guideline range.

25   *THE COURT:* Thank you. Mr. Harvey?

1          *MR. HARVEY:*  Yes.  If Your Honor, if I may, just

2     Mr. Dunlap in paragraph 86 of the presentence report worked

3     as a forklift operator for his dad from 2010 to 2018.  So the

4     characterization that his only employment was selling drugs

5     is not accurate based upon the presentence report which you

6     have adopted.

7          Your Honor, with respect to the issue of what happened

8     at the beginning of the case, memory serves me correct, Mr.

9     Dunlap engaged my services and he made a voluntary

10    appearance, so, you know, I think to try and interject that

11    episode of the case in the argument for a basis for

12    sentencing -- once he obtained -- is inappropriate -- he

13    obtained counsel, he voluntarily appeared.  So I just think

14    that Your Honor should base her decision on meritorious

15    information that's been presented rather than an episode from

16    early on in the case.

17         Your Honor, again, you have heard what we have

18    articulated.  You're aware how Terrence did accept

19    responsibility for his conduct, which again I believe

20    indicates growth, is something to be considered.  And I

21    appreciate the US Attorney's Office recognizing the issue

22    with his criminal history, and I think that's something the

23    Court should strongly consider.

24         And I don't agree with Ms. Taylor about much in this

25    case, but I do have to give her accolades when it's deserved,

1 and I think that her -- it's a deserving accolade that she

2 will articulate to the Court that she recognizes the issue

3 with his criminal history and how it does impact the severity

4 of his sentence.

5     I'll defer to my colleague, Mr. Mills.

6         *THE COURT:* Yes. Mr. Mills, did you have something

7 you wanted to add?

8         *MR. MILLS:* Well, Your Honor, again, I'm cognizant

9 that there's a drug conviction, but I'm going to argue my

10 silo for a moment --

11         *THE COURT:* Okay.

12         *MR. MILLS:* -- because I've got a client who is

13 looking at a level 38 which would otherwise be a level 17 but

14 for the drug conviction. Okay?

15     I know the Court has overruled the objection on the

16 criminal history category, but I think that's a very, very,

17 very important thing recognized by Ms. Taylor, argued by Mr.

18 Harvey, and reiterated by me is that when you're up in this

19 level, even in criminal history one or two, we are talking

20 about a one-level enhancement, like in this instance is about

21 two and a half years. Okay?

22     So, it's really important that the Court consider that.

23 If I'm looking at a variance for my personal -- like

24 correct -- well, not correct the record, supplement it.

25 Although he did drop out of high school, he did get his GED,

1    so he did go through with that and it was -- there's

2    completely there -- that characterization.

3        But the idea that he's going to -- the co-defendants in

4    this case that I have have got plea deals talking about a

5    12-month sentence.  Okay?  He's looking at a 20 times that

6    amount, more than 20 times that amount when you are looking

7    at a 262.

8        Talk about a disparity in sentencing for the similar

9    conduct.  So even if you look at his--

10       THE COURT:  I know, but Mr. Dunlap earned that

11   distinction and discrepancy by committing the primary offense

12   for which he was being tried when he committed the second.

13       MR. MILLS:  I understand--

14       THE COURT:  So it's -- we are not talking apples to

15   apples here.  So, yeah.

16       MR. MILLS:  But we are talking about that when it

17   gets added on two-level enhancements at that end of the

18   category, it's not like being added on two levels lower down

19   the rung.  It's very substantial in that amount, and so I

20   think that's a reason for the Court to variance at least a

21   level or two on that, on the -- off the 38 based on the

22   disparity in the co-defendants' case.

23       I understand there's a separate basis on that.  But when

24   I'm looking at the case that I have, that's a vast disparity

25   difference.  And even the adjusted level was a 30, but it

1    gets bumped up because of the highest level.

2        So the guidelines completely overrepresent his conduct

3    for this, a serious charge.  But you're talking about 262 on

4    this charge, and that just seems improper, Your Honor.

5            THE COURT:  All right.  Thank you.  All right.  I'm

6    going to take a -- unless somebody would like to say anything

7    before I do, I'm going to take a short recess to think about

8    this for a second.

9            MS. TAYLOR:  I just wanted to clarify a couple

10   things.  Mr. Harvey is correct.  I missed the paragraph that

11   talked about his work for his father as a forklift driver.

12   But I also want to remind the Court or point out to the Court

13   that, yes, he may have retained Mr. Harvey and turned himself

14   in, but we started looking for him and advised his family of

15   the outstanding warrant in September.

16       He did not turn himself in until November.  So, he was a

17   fugitive for approximately two months before appearing before

18   this Court.  And the fact that he later retained Mr. Harvey

19   and turned himself in does not --

20           THE COURT:  Right.

21           MS. TAYLOR:  -- counteract the fact that he was

22   running from the police for two months.

23           THE COURT:  Okay.  All right.  Very good.  Let's

24   take about a 10-minute recess and let me think this over for

25   a second.  I will be back with my sentence.

1          (Whereupon, a brief recess was had.)

2               *MR. MILLS:* Judge Lewis? Just in the break, Mr.

3    Harvey and I had an opportunity to consult with Mr. Dunlap

4    about his right to allocute to the Court prior to sentencing.

5    He has chosen not to, but did want me to make a quick couple

6    comments to the Court that he wants --

7               *THE COURT:* Okay.

8               *MR. MILLS:* -- the Court to be aware of before

9    passing judgment. Mainly, again, that--

10              *THE COURT:* So Mr. Dunlap, you don't wish to

11   address the Court?

12              *THE DEFENDANT:* No, ma'am. I -- no, ma'am. I'd

13   rather have my counsel speak for me.

14              *THE COURT:* All right. All right.

15              *THE DEFENDANT:* Because I'm up under oath and I

16   don't know, you know, anything I want to say may affect my

17   appeal or anything else.

18              *THE COURT:* All right. Well, I just want to make

19   sure you understand you do have the right --

20              *THE DEFENDANT:* Yes, ma'am.

21              *THE COURT:* -- to address the Court, and if you

22   want to do that, I'm happy to listen to you. But if you'd

23   like to have Mr. Mills relay information to me on your

24   behalf, that's fine as well.

25              *THE DEFENDANT:* Yes, ma'am.

1          *THE COURT:*  Okay.  All right.

2          *MR. MILLS:*  And Your Honor, doing this on behalf of

3    myself and Mr. Harvey, and of course what Mr. Dunlap wants

4    relayed is obviously these events have portrayed one side and

5    probably the worst side of his life but not necessarily a

6    whole picture of who he is.

7          So, I think that he wants the Court to understand as

8    well that he has not had an experience with the criminal

9    justice system, and that the sentence that he's looking at is

10   equal to the amount of time he's lived this far, and that the

11   sentences -- that he understands and accepts the seriousness

12   of the consequences that's going to happen and asks the Court

13   to just to take in consideration his age and his criminal

14   history and the love of his family and the return for that in

15   setting a sentence today.

16          *THE COURT:*  All right.  Thank you.  All right.

17   Well, I believe that we correctly calculated the guidelines

18   and have noted the right and applicable statutory factors.

19   And I think considering, you know, everything I have heard

20   here, we have two serious, two very serious offenses; the

21   drug trafficking offense, the drugs involved, the quantities

22   involved, you know, it's just a very serious, serious

23   problem.

24          And you know, having tried this case, I'm familiar with

25   all the different members of this conspiracy and this

1  organization, just sort of the brazen, aggressive nature of

2  it.

3       I mean, co-defendant Glenn Pernell that everybody's

4  taking orders from is incarcerated.  And all these folks are

5  doing his bidding because he's incarcerated.  We're paying to

6  keep him locked up, and Mr. Dunlap and others are making sure

7  he just keeps on, keeps on trucking on with his illegal

8  business.  And all the problems that are created by these

9  kinds of drug organizations, I mean, they are well known to

10  everybody.

11       Then of course, they are serious and that's why the

12  statutes provide what they provide and that's why the

13  guidelines are as steep as they are because they are meant to

14  deter people from engaging in this kind of conduct.

15       And we also have to me an equally, perhaps more serious

16  offense, of the jury tampering.  It's just very hard for me

17  to think of anything that is more disruptive to our society

18  than interfering with the right to a jury trial.  Everybody

19  relies on that.  Criminal defendants rely on that, I rely,

20  the public relies on it.  It's a system.

21       And the cavalier just to be sitting here in a trial for

22  three weeks and having your family there viewing you.  Lucky

23  to be out bond.  And what do you do with that right?  Well,

24  you get in the car with your family members and try to

25  intimidate a juror.

1          I mean, it's a miracle that we didn't have a mistrial.

2     If it hadn't been for my courtroom deputy making sure he did

3     not have any contact with any of the other jurors, it would

4     have been a mistrial, we'd have had to start all over again.

5     It's almost four weeks of trial.

6          I mean, think about the costs to the government.  All

7     the taxpayers are paying for that.  And everybody out here is

8     coming into this courtroom, especially a federal courthouse,

9     and knowing, being able to rely on the fact that the -- with

10    the lawyers both doing what they are supposed to do and me

11    doing what I'm supposed to do, that the defendants are going

12    to get a fair trial and that jury is going to decide their

13    fate based on evidence, not on bribes.

14         But to just do that, I just -- I find that unimaginable.

15    And I know when I have talked with people, say oh gosh, in

16    all the years that I have been doing this, that has never

17    happened.  Well, I hope that's true, but I suspect it's not.

18    You just picked the wrong juror to bribe.  I'm sure some

19    jurors have been bribed and justice has not been carried out

20    because of that.

21         But if I have got anything to do with it, people are

22    going to understand, cannot do that.  It's just -- it's just

23    so beyond the pale.  It's not just an offense to me and the

24    people that are doing the trial, it's an offense to society

25    to come in and mess with the judicial system like that, that

1  you're going to bribe somebody.

2      I mean, it's just -- it's a miracle that we were able to

3  get through that without it all being a waste.  So any way,

4  I'm obviously concerned about that.

5      When I look at the 3553(a) factors, which is what I have

6  to in every sentencing, and think about the reasons that the

7  defense has put forth for me to vary below those -- and I'm

8  not one to hesitate about varying.  I do it all the time when

9  I think it's appropriate.  But save for one small factor, I

10  don't see anything that would justify a variance on your

11  part.

12      You think about the purposes of sentencing, and a lot of

13  times I'm thinking how much will it take to get this person's

14  attention and get them on a different path and sort of have a

15  calculus for that, but I'm sorry to say for you my main

16  concern is just keeping you out of circulation because you

17  weren't deterred.

18      Here you have been indicted by a federal grand jury,

19  going to trial in a case with the damning evidence against

20  you, okay, and you're -- are you hesitating to commit a

21  crime?  Your family is not.  They see all this going on, too.

22  They are not hesitating.  There's not one bit of respect for

23  the judicial system and for our laws, and I don't know if

24  you'll ever learn that.  I -- I don't know.

25      But I did say save for one factor, and that is your

1   criminal history is a two, and it's a well-earned two.  I do

2   not think that it's substantially overstated at all.  I mean,

3   you did in fact commit those crimes and you were only

4   assigned a single point for those.  But the result of that

5   has I think in your case led to a result that's maybe a

6   little bit more than necessary.

7       So for that reason, I am going to grant a variance from

8   the bottom of the guideline down to -- I'm going to vary by

9   30 months, which is approximately the result of moving you

10  out of a criminal history category one to a criminal history

11  category two as a result of those simple possession of

12  marijuana convictions.

13      So, having calculated and considered the advisory

14  sentencing guidelines and also the relevant statutory

15  sentencing factors that are contained in 18 USC 3553(a), it

16  is the judgment of the Court that the defendant, Terrence

17  Vernon Dunlap, is hereby committed to the custody of the

18  Bureau of Prisons to be imprisoned for a term of 232 months.

19      This term consists of 232 months as to Count One, 48

20  months as to Count 21, and 232 months as to Count 49.  In

21  Count One -- okay.  That's not right.  230 months -- 232

22  months as to Count One, 48 months as to Count 21, and 232

23  months as to Count 49 and Count One, said terms to run

24  concurrently.

25      Defendant shall also forfeit his interest in property as

directed in the preliminary order of forfeiture that was

filed earlier today, and that order is incorporated into this

judgment.

It appears that Mr. Dunlap does not have the ability to

pay a fine, and therefore the fine is waived.  But he shall

pay the mandatory $400 special assessment fee consisting of a

hundred dollars as to each count, which is due and payable

immediately.

Upon release from imprisonment, the defendant shall be

placed on supervised release for a term of five years.  This

term consists of five years as to Count One, one year as to

Count 22, and three years as to Count 49 and Count One of the

other docket, those terms to run concurrently.

While on supervised release, the defendant shall comply

with the mandatory and standard conditions of supervision

that are outlined in 18 USC 3583(d) and guideline 5D1.3(a) as

noted in paragraphs 94 and 97 of the presentence report.

Standard conditions of supervision one through nine and

13 serve the statutory sentencing purposes of public

protection and rehabilitation.

Standard conditions of supervision 10 and 12 serve the

statutory sentencing purpose of public protection.

And standard condition of supervision 11 ensures that

the defendant does not engage in conduct that may potentially

conflict with the other conditions of supervision and may

1  pose risk to the defendant's probation officer.

2      The defendant shall also comply with the following

3  special conditions for the reasons that are set forth in the

4  presentence report which has previously been adopted as the

5  finding of facts for the purposes of this sentence:  The

6  defendant must submit to substance abuse testing to determine

7  if he has used a prohibited substance and, if able, he shall

8  contribute to the cost of that program not to exceed the

9  amount that is determined reasonable by the Court-approved US

10  Probation Office's sliding scale for services, and cooperate

11  in securing any applicable third party payment such as

12  insurance or Medicaid.

13      So as to Counts One, 21, and 49 of the superseding

14  indictment in docket 3:17-811 and Count One of the indictment

15  in docket 3:19-781, I find this sentence is reasonable under

16  the facts and circumstances of these cases and that it is

17  sufficient but not greater than necessary to achieve the

18  purposes of sentencing.

19      That is my sentence.  Are there any substantive or

20  procedural errors anyone wants to bring to my attention?

21          *MS. TAYLOR:*  Not by the government, Your Honor.

22          *MR. MILLS:*  Not on behalf of Mr. Mills.

23          *MR. HARVEY:*  None, Your Honor.

24          *THE COURT:*  Okay.  All right.  Let me tell Mr.

25  Dunlap, sir, you have 14 days from the date of the judgment

1   order to file any notice of appeal.  All right.

2       Anything further on this matter?

3           *MS. TAYLOR:*  I don't believe so.  I don't believe

4   there would be any counts to dismiss.  I will ask--

5           *THE COURT:*  That's right.

6           *THE CLERK:*  The original indictment and Count 20 of

7   the superseding indictment that--

8           *MS. TAYLOR:*  Did we not dismiss Count 20 at the

9   time of the trial?

10          *THE CLERK:*  You did, but...

11          *MS. TAYLOR:*  All right.  We move to dismiss any

12  remaining counts of which he was not convicted.

13          *THE COURT:*  All right.

14          *MR. MILLS:*  Your Honor?

15          *THE COURT:*  Yes.

16          *MR. MILLS:*  There's one point of clarification when

17  we were discussing with Mr. Dunlap about his notice of intent

18  to appeal with these two cases.  Do we need to file two

19  separate notices of intent to appeal with the Clerk's office?

20          *THE CLERK:*  Yes, he does.

21          *THE COURT:*  Yes.

22          *MR. MILLS:*  Okay.

23          *THE COURT:*  Yes.  Okay?

24          *MR. MILLS:*  Will do.

25          *THE COURT:*  All right.  Thank you.

1          *MS. TAYLOR:*  Thank you, Your Honor.

2       (Hearing concluded.)

3                              ***

4       I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7       s/Kathleen Richardson

8       _____          March 17, 2022

9       Kathleen Richardson, RMR, CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25